# In the United States Court of Federal Claims

No. 24-1695
Filed: March 4, 2025
Reissued: March 17, 2025†

---

**WARRIOR FOCUSED SOLUTIONS, LLC,**

    *Plaintiff*,

v.

**THE UNITED STATES,**

    *Defendant*,

and

**VALIANT GLOBAL DEFENSE SERVICES, INC.,**

    *Intervenor-Defendant*.

---

*W. Brad English*, *Emily J. Chancey*, *Michael R. Pillsbury*, *Taylor R. Holt*, and *Hunter M. Drake*, Maynard Nexsen, PC, Huntsville, Alabama, for Plaintiff.

*Daniel Bertoni*, Trial Attorney, Commercial Litigation Branch, Civil Division, *Douglas K. Mickle*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, U.S. DOJ, Washington, D.C.; with *CPT Sana H. Daniell*, Trial Attorney, U.S. Army Legal Services Attorney, for the United States.

*Daniel R. Forman*, *Cherie J. Owen*, and *Roxanne N. Cassidy*, Crowell & Moring LLP, Washington, D.C., for Intervenor-Defendant.

### MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

    In government contract proposals, clarity is paramount. Ambiguity frequently results in unsuccessful bids, as demonstrated in this instance. The United States Army Mission and

---

† This Opinion was originally issued under seal, (ECF No. 46), and the parties were directed to file a notice of redactions consistent with the Court's instructions. That Notice was filed on March 17, 2025. (ECF No. 48). The Court accepts all proposed redactions. The sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

Contracting Command ("the Army") issued the underlying procurement for training services at Fort Johnson, Louisiana. (Administrative Record ("AR__") at 1, ECF No. 41).[1] Warrior Focused Solutions ("WFS") filed this post-award bid protest seeking declaratory relief and requesting the Court enjoin the performance by Intervenor-Defendant Valiant Global Defense Services, Inc. ("Valiant"). (*See generally* Am. Compl., ECF No. 25).

The combination of a waived argument and proposal ambiguities prevents WFS from meeting its burden. WFS's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 27), is **DENIED**. The United States' and Valiant's Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 29; Int-Def.'s xMJAR, ECF No. 28), are **GRANTED**.

## I.   Background

Located in Louisiana, the U.S. Army's Joint Readiness Training Center ("JRTC") trains military forces for worldwide deployment across a range of potential theaters and conflicts. (AR1147). To fulfill this mission, the Army procures Mission Support Services ("MSS") for Army special operation units and similar units from the Marines, Navy, and Air Force. (AR1109). In addition to eight to ten annual rotational exercises, the JRTC MSS contractor also performs scenario development, property management, technology services, after-action reviews, video support, and role-play of civilians on the battlefield. (AR1148). On January 12, 2024, the Army issued a Request for Proposals ("the Solicitation") seeking such mission support services at the JRTC.[2] (AR1268).

### *A.   The Acquisition*[3]

The Solicitation provided for the award of cost-plus-fixed-fee contract line item numbers ("CLINs"), cost reimbursement CLINs, and some firm fixed price CLINs. (AR2375–78). The Army intended award to a single contractor following a best value source selection, based on a "subjective tradeoff between cost and non cost factors." (AR2441). The Solicitation laid out four evaluation factors: Factor 1–Mission Capability, Factor 2–Past Performance, Factor 3–Small Business Participation, and Factor 4–Cost. (AR24441–42). Mission Capability was the paramount non-cost factor, with Past Performance and Small Business Participation considered equal, but of secondary importance. (AR2441). All factors "other than cost or price, when combined, [were] approximately equal to cost or price." (*Id.*).

---

[1] The Administrative Record in this case was exchanged using the Justice Enterprise File Sharing ("JEFS") System. A Joint Appendix with the abbreviated record was filed after briefing. (Administrative Record ("AR"), ECF No. 41).

[2] Request for Proposals No. W911S821R0017 (the "Solicitation"). Further, unless otherwise indicated, the dates referenced herein occurred in 2024.

[3] The Court provides some overview of these factors but will discuss them at length as they arise in the Analysis section below.

The evaluation of Mission Capability focused "on how well the Offeror . . . demonstrated a feasible structure and approach to ensure it has the ability to execute [Performance Work Statement ("PWS")] requirements." (AR2442). The Army evaluated each Offeror's approach by creating two equally important subfactors within Mission Capability: Subfactor 1–Management Approach and Subfactor 2–Technical Approach. (AR2442–46).

Recency, relevancy, and quality were the key criteria for the Army's Past Performance evaluation. (AR2446). Recent references were for work performed within the past three years. (AR2447). The Army planned to grade the relevancy of each reference on a sliding adjectival scale. (*Id*.). The Army's quality review relied on customer input regarding the offeror's performance on previous contracts. (*Id*.). The Army's Past Performance evaluation was meant to result in a confidence rating ranging from Substantial Confidence to No Confidence. (AR2448). For Factor 3, the Army committed to evaluating the proposed level of small business participation in the acquisition's performance. (*Id*.). The evaluation would compare that participation to the objectives and Minimum Quantitative Requirements established in the Solicitation. (*Id*.).

The collective importance of these three factors was approximately equivalent to that of Cost. (AR2441). Beyond assessing cost reasonableness, the Army intended to evaluate cost realism and adjust figures to determine the most probable performance cost. (AR2449). The Army informed offerors that the most probable cost would be used to determine the best value. (*Id*.).

B.   *Evaluation and Award*

Only WFS and Valiant submitted bids. (AR Tab 24 (Valiant's Bid); AR Tab 25 (WFS's bid)). Valiant's total evaluated price was $444,672,556.75, and WFS's total evaluated price was $432,195,605.95. (AR5733). After conducting evaluations, the Source Selection Evaluation Board ("SSEB") produced its report on July 17; its results are summarized below:

| Factor | Description | Offer 1 - Valiant Global Defense Services Inc. | Offeror 2 - Warrior Focused Solutions, LLC |
|---|---|---|---|
| (1) Mission Capability (Subfactor 1 - Management Approach) | Outstanding, Good, Acceptable, Marginal, Unacceptable | Outstanding | Good |
| (1) Mission Capability (Subfactor 2 - Technical Approach) | Outstanding, Good, Acceptable, Marginal, Unacceptable | Outstanding | Acceptable |
| (1) Mission Capability Overall Rating | Outstanding, Good, Acceptable, Marginal, Unacceptable | Outstanding | Acceptable |
| (2) Past Performance | Substantial Confidence, Satisfactory Confidence, Neutral Confidence, Limited Confidence, No Confidence | Substantial Confidence | Satisfactory Confidence |
| (3) Small Business Participation | Outstanding, Good, Acceptable, Marginal, Unacceptable | Good | Good |
| (4) Cost | Total Evaluated Price | $444,672556.75 | $432,195,605.95 |
| | Most Probable Cost | $478,079,108.95 | $488,325,407.81 |
| | Balance (Yes/No) | Yes | Yes |
| | Price Reasonableness (Yes/No) | Yes | Yes |
| | Realism (if done) (Yes/No) | Yes | Yes |
| | Variance % between total evaluated price & IGE | 24% | 26% |

(AR5733–34). In its tradeoff analysis, the Army stated:

> Due to their outstanding technical rating, substantial confidence past performance assessment, and having the lowest Most Probable Cost, Valiant's proposal maximizes the Government's ability to obtain best value. Entering discussions and allowing [WFS] to submit a revised proposal addressing identified weaknesses, significant weaknesses, and uncertainties would not change the overall end state due Valiant's significantly higher rated proposal.
>
> In accordance with the evaluation criteria, the proposal from Valiant Global Defense Services, Inc, is the best value to the Government and is considered fair and reasonable based on adequate price competition. The superior non-cost mission capability and past-performance factors easily support the awarding to Valiant at the approximately 3% higher proposed price.

(AR5826).

Based on its findings, the Source Selection Advisory Council recommended that the Source Selection Authority ("SSA") award the JRTC MSS contract to Valiant. (AR5825 ("The comparative analysis of both proposals clearly indicates [Valiant] maximizes the Government's ability to obtain best value for this critical acquisition.")). The SSA followed that recommendation. (AR5794; AR5826). Accordingly, the SSA decided that "entering into discussions and allowing WFS to submit a revised proposal addressing identified weaknesses, significant weaknesses, and [u]ncertainties, would not change the overall end state due [to] Valiant's significantly higher rated proposal." (*Id*). Following the Army's September 26 award of the JRTC MSS contract to Valiant, (AR5853), this litigation ensued, (*see generally* Am. Compl.). Valiant is currently performing the contract. (*See* Compl. at 26 n.1, ECF No. 1; Def.'s xMJAR at 2).

## II. Discussion

WFS now protests the Army's decision. WFS summarizes its qualms in seven counts:

> Section I shows that the Army unlawfully issued the Solicitation in violation of the approved Acquisition Plan and Acquisition Strategy. Section II reveals the Army's errors when evaluating [WFS] under Factor 1, Subfactor 2– Technical Approach. Section III explains that the Army unreasonably evaluated [WFS]'s Small Business Participation proposal and abused its discretion by failing to use clarifications to address minor clerical issues. Section IV proves that the Army's most probable cost adjustments to [WFS]'s indirect rates deviated from the Solicitation's terms and were irrational. Section V shows that the tradeoff decision was infected with the errors mentioned above, which made it irrational. Sections VI and VII prove that the errors prejudiced [WFS] and the Court should enter injunctive relief.

(Pl.'s MJAR at 6; *see also* Am. Compl.). The Court examines each claim.

4

*A.     Jurisdiction and Standard of Review*

The Tucker Act provides that an interested party may file an action in the Court of Federal Claims "objecting [(1)] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [(2)] to a proposed award or [(3)] the award of a contract or [(4)] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Aero Spray*, *Inc. v. United States*, 156 Fed. Cl. 548, 559 n.18 (2021) ("Section 1491(b) actions are typically referred to as 'bid protests.'").[4] According to 28 U.S.C. § 1491(b)(4), the Court typically reviews agency procurement decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA standard, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA)*, *PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013).

Judicial review of agency action under the APA typically proceeds on two tracks; the Court could find: (1) the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the agency's procurement procedure involved a violation of regulation or statute. *Weeks Marine*, *Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). To obtain relief, after showing that the procuring agency violated the law or acted arbitrarily and capriciously, the protestor must also show that the agency's violation was prejudicial to the protestor. *Glenn Def. Marine*, 720 F.3d at 907. This standard is "highly deferential." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). A "protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a 'best-value' procurement." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

All parties move for judgment on the Administrative Record. *See* RCFC 52.1. Unlike the standard applied in summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys.*, *Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see also* RCFC 56. Rather, the Court's inquiry focuses on whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

*B.     WFS waived its argument regarding discussions.*

WFS initially contends that the Army's Solicitation improperly deviated from the approved Acquisition Plan and Strategy documents, which WFS purports mandated discussions or adherence to Defense Federal Acquisition Regulation Supplement ("DFARS") discussion provisions. (Pl.'s MJAR at 6). The Court finds that WFS's failure to timely protest these

---

[4] Standing is an integral part of jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, (1992). Here, the United States does not challenge standing. Further, other than the awardee, WFS was the only other bidder; by virtue of this, the Court finds that WFS has established standing.

grounds, as dictated by the *Blue & Gold* doctrine and reinforced in *Oak Grove*, bars WFS from raising this challenge now. *See Blue & Gold Fleet*, *L.P. v. United States*, 492 F.3d 1308 (2007); *Oak Grove Technologies*, *LLC v. United States*, 116 F.4th 1364 (Fed. Cir. 2024).

In the summer of 2023, the Army finalized its Acquisition Plan, (AR Tab 9), and its Acquisition Strategy, (AR Tab 10). As to discussions, the approved Acquisition Plan said "[i]n accordance with DFARS 215.306(c)(1) the Government **will conduct discussions**." (AR1129 (emphasis added)).[5] The Acquisition Plan's timeline anticipated the award the following July and included time for discussions. (AR1131). On December 8, 2023, the Army published a pre-solicitation notice on SAM.gov. (AR Tab 12; AR1261). The Army approved its Source Selection Plan on January 8, 2024. (AR1180–82).

Despite the approved acquisition documents indicating that discussions would be held, the Army's solicitation unequivocally stated that the Army intended to award a contract "**without discussions**," a deviation from the approved plan. (AR1208; AR1222; AR1334 (emphasis added)). WFS argues that this divergence from the acquisition documents and the decision—either active or inactive—to do so was unlawful. (Pl.'s MJAR at 6–12). The United States and Valiant maintain that WFS waived this argument through its failure to timely object. (Def.'s xMJAR at 14–18; Int-Def.'s xMJAR at 9–11). Thus, before the Court may consider the merits of WFS's argument, it must consider the applicability of the waiver doctrine under *Blue & Gold* and *Oak Grove Technologies*.[6] 492 F.3d 1308; 116 F.4th 1364.

The government must conduct acquisitions in accordance with applicable law. *See*, *e.g.*, *Indus. Prop. Mgmt., Inc. v. United States*, 59 Fed. Cl. 318, 323 (2004); *see also* 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(1). However, a bidder with knowledge of a solicitation defect may not choose to stay silent when submitting its proposal. The *Blue & Gold* rule solidifies this, dictating that a party forfeits its ability to challenge a "patent error" in a government solicitation if it does not object before the close of bidding. 492 F.3d at 1313. A "patent error" is defined as an obvious omission, inconsistency, or discrepancy of significance, one that could be discovered

---

[5] For an acquisition estimated to cost in the hundreds of millions of dollars, (*see* AR488), the Army was required to develop an acquisition plan. DFARS § 207.103(d)(i). The FAR establishes rules for an acquisition plan: it "must address all the technical, business, management, and other significant considerations that will control the acquisition" and include "acquisition background and objectives" and a "plan of action." FAR § 7.105. In addition, for acquisitions involving an estimated value of $100 million or more, "contracting officers *should* conduct discussions." DFARS § 215.306(c)(1) (emphasis added). WFS challenges the deviation from the Acquisition Plan rather than the DFARS directory language suggesting that COs *should* conduct discussions. (*See* Pl.'s MJAR at 6–12).

[6] The Court considers the issue of waiver under the RCFC 12(b)(6) standard. *See*, *e.g.*, *Eagle Hill Consulting, LLC v. United States*, 171 Fed. Cl. 115, 130 (2024); *Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 95 (2021).

through reasonable and customary care. *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020).

The Federal Circuit has recently, during the pendency of this case, addressed the *Blue & Gold* waiver rule. In *Oak Grove*, the protestor identified various alleged Army failures before the bid submission deadline but attempted to highlight the Army's failure to engage in required discussions after the bidding process closed. *Oak Grove Technologies*, 116 F.4th at 1378. The Federal Circuit overturned the Court of Federal Claims' decision regarding the protestor's challenge to the agency's lack of discussions. *Id*. The Federal Circuit ruled that the Army's inclusion of conflicting clauses regarding discussions—one allowing for their absence and another strongly encouraging them—resulted in a patently ambiguous solicitation. *Id*. The Court further held that Oak Grove's failure to challenge this ambiguity prior to the proposal submission deadline constituted a waiver of its discussions argument under the *Blue & Gold* doctrine. *Id*.; *see also Blue & Gold Fleet*, 492 F.3d at 1314.

Recognizing that *Oak Grove* would foreclose its path to objecting to the terms of the solicitation, WFS attempts to distinguish its argument. (Pl.'s MJAR at 12 ("Though *Oak Grove* came out well after bidders submitted proposals in this acquisition, we recognize that [WFS] cannot challenge the Army's decision not to hold discussions or to follow the DFARS generally in this post-award protest.")). Instead, WFS states that "the focus of this count is that the Army did not decide to forego discussions or ignore the DFARS[,]" but it was the SSA in the driver's seat, making that decision without the necessary approval. (*Id*.). In other words, WFS's challenge is directed at the Army's internal decision-making process and its failure to follow the relevant regulations. This is a distinction without a difference.

A party cannot shield a claim of statutory non-compliance by merely characterizing it as a challenge to the agency's decision-making process. Essentially, the core of WFS's objection pertains to a solicitation term it failed to challenge despite multiple opportunities to do so throughout nine amendments.[7] WFS's inventive attempt to carve out its argument cannot be distinguished from a statutory violation claim. Significantly, the Federal Circuit did not limit its decision in *Blue & Gold* to non-statutory violations. Furthermore, the Federal Circuit has broadened the scope of the waiver rule since *Blue & Gold*. For instance, in *COMINT*, the Federal Circuit expanded the waiver rule, noting that "[t]he same policy underlying *Blue & Gold* supports its extension to *all* pre-award situations[,]" and indicating that "assuming that there is adequate time in which to do so, a disappointed bidder *must* bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012) (emphasis added). Even reading WFS's claims generously, the Court is not aware of, and WFS does not cite, any precedent that would establish an agency's deviation from its Acquisition Strategy or Acquisition Plan as a valid, separate basis for a post-award bid protest.

---

[7] WFS acknowledges its notification, recognizing the Solicitation's intent despite the deviation from acquisition documents and potential applicability of DFARS 215.306. (*See* Pl.'s MJAR at 9).

While the *Blue & Gold* waiver may, at times, appear to prioritize the efficient functioning of the bidding process over detailed scrutiny of agency action, even when such scrutiny may reveal errors, it is nonetheless the controlling legal principle. The Army's no-discussion stance remained consistent from the initial public solicitation throughout its nine subsequent amendments. (AR2441–42). WFS's attempts to provide a rationale for its untimely challenge by referencing acquisition documents that initially anticipated discussions are ultimately ineffective. While the Army's deviation may be troubling, the protestor's characterization of this deviation as a violation of the acquisition plan, rather than a direct challenge to the solicitation, does not alter the outcome. This claim should have been presented prior to the award, and consequently it must be dismissed.

   C. *The Army's Mission Capability and Small Business Proposal evaluations were not unreasonable.*

WFS next contends that the Army's evaluation deficiently analyzed various aspects of its proposal, leading to the erroneous assignment of weaknesses and significant weaknesses. (Pl.'s MJAR at 12–25). These purportedly unreasonable evaluations are specific to WFS's ratings on Factor 1—Mission Capability and Factor 3—Small Business Participation proposal. The Court determines these objections to be matters of procurement minutiae and finds that WFS has not discharged its evidentiary burden.

This Court routinely holds that contracting officers enjoy "broad discretion with respect to evaluation of technical proposals[,]" and the Court typically does not "second guess the technical ratings that the source selection committee gave to each offeror." *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 104 (2006) (quoting *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002)); *Mortg. Contracting Servs. v. United States*, 153 Fed. Cl. 89, 126 (2021) ("The court must especially defer to the agency's technical evaluations . . . and other 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials.'" (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449)). However, the Court has cautioned that "unsuccessful offerors repeatedly ignore this" standard. *AccelGov, LLC v. United States*, 170 Fed. Cl. 508, 518 (2024).

The goal of bid protests is to ensure fairness and transparency in the procurement process, not to provide a forum for bidders to challenge every minor disagreement with an agency's evaluation. These limitations promote efficiency and maintain an appropriate distance between the judiciary and the day-to-day management of government contracting. This is why agencies retain such broad discretionary authority when determining the scope of an evaluation factor. *See Summit Techs., LLC v. United States*, 151 Fed. Cl. 171, 180 (2020); *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010). As the disappointed offeror, WFS bears the heavy burden of showing that the Army's evaluation lacked a rational basis. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (addressing burden of proof in negotiated procurements). "[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (internal quotation marks and citations omitted).

WFS first claims that the Army unreasonably deviated from the Solicitation when it gave WFS a weakness for PWS Paragraphs 5.8.3.2(c) & (d). (Pl.'s MJAR at 13). These sections required offerors to "describe[] the methodology, rationale, and procedures to successfully execute tasks identified in PWS Section 2.1.9."[8] (AR2445). The JRTC MSS contractor's duties under this point include producing and editing video, and Section 5.8.3.2 of the PWS lists requirements for the contractor regarding Mobile Production Center ("MPC") vans. (AR2235). Specifically, the contractor was required to set up and operate the three MPCs. (*Id.*).

The Army found that WFS's proposal on this point "demonstrate[d] a lack of understanding" because WFS "failed to clearly articulate the number of MPC vans they intend to provide[.]" (AR5818). WFS believes such a finding was unreasonable because the PWS already specified the required number of vans. (Pl.'s MJAR at 14 (citing AR2235)). WFS contends that elaboration would be mere repetition of solicitation language, which does not satisfy the requirement for an adequate explanation of a bidder's approach. (*Id.*). The assertion that parroting solicitation terms is inadequate is correct, but it must not be considered in isolation. *See Sci. Applications Int'l Corp v. United States*, 108 Fed. Cl. 235, 259 (2012) ("reiterating RFP requirements without detailing how those requirements would be met did not comply with the material technical requirements of the Solicitation") (citing *Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 785–89 (2009)). Though mere repetition is insufficient, an offeror retains the responsibility to state its compliance with the solicitation's requirements explicitly.

As to the merits of its argument, WFS's proposal overlooked the varying operational timeframes for the MPC vans. In the JRTC Site Visit Briefing slides, (*see* AR Tab 23a), the Army informed prospective bidders of a typical rotation calendar:



---

[8] PWS 2.1.9 refers to "[a]ll operations to include all personnel, supervision, non-personal services, and other items necessary to support the [Forces Command ("FORSCOM")] [JRTC] Ft Johnson, LA in strict compliance with the attached [PWS] tasks 5.1, 5.2, 5.3, 5.4, 5.5, 5.6, 5.7, 5.8, 5.9, 5.10, 5.11, 5.12, 5.13 and all subparts." (AR2150–51).

(AR2461).[9] The Army's concerns reiterated that the PWS required the JRTC MSS contractor to operate one MPC van beginning on day R-6, and then operate all three MPC vans starting on day T-1. (AR2235). WFS's proposal states that "[e]ach MPC operates 24x7 from D-4 through [Change of Mission,]" (AR4147), ignoring the relevant timeframe. Given the lack of responsiveness to the solicitation's stated timeframes, this reasonably creates uncertainty for the Army's mission. Therefore, it cannot be said that the Army unreasonably assigned a weakness.

WFS also believes that the Army "unreasonably" gave WFS a weakness for PWS Paragraph 5.8.4.2 based on an assumption that it would do more work than required. (Pl.'s MJAR at 14). Section 5.8.4.2 of the PWS requires the JRTC MSS contractor to produce Battle Execution Summary ("BES") recordings to use in After Action Review ("AAR"). (AR2238). The PWS states that a BES recording request "will typically be submitted on T-1 and the narration script no later than [thirty-six] hours prior to AAR." (*Id.*). WFS's proposal stated:

> The BES recording, or "HOOAH Film," serves as a motivational video when presented at the start of the final AAR for the BCT and subordinate battalions. The Editing Team Lead, coordinating with the Training Analysis and Feedback Facility Officer, receives initial BES guidance NLT D-4. A follow-on pre-rotational meeting with the Video Lead, Editing Team Lead, and Field Camera Team Lead results in a synchronized video "shoot" plan to efficiently capture RTU combat operations at key locations and periods throughout the rotation. Raw video footage ingested into JRTC-IS VRME enables TAF analysts and OCTs to rapidly recall the data and build meaningful AARs. Level II/III Photographers are proficient in the use of airborne vehicle identification (AVID) digital editing system and are frequently used for surge video editing when needed. BES recordings meet the highest quality standards and are included in RTU's THP.

(AR4147). Importantly, this portion of WFS's proposal is silent as to the PWS's T-1 date.

The United States asserts that, based on the information and WFS's mention of the D-4 date for guidance, the Army "understood that WFS intended to add five days to the schedule specified in the PWS, and assigned WFS a weakness." (Def.'s xMJAR (citing AR5818)). The United States goes on to say that WFS's proposal does not explain what WFS now clarifies for the Court—that the additional days are included to "ensure it had time to complete the requirement," and that WFS would not bill for more work "simply because it had more time to complete the job." (*Id.* (citing Pl.'s MJAR 15)). The Court agrees that this failure to explain led to WFS's assigned weakness. While the explanation presented in WFS's brief is coherent, its post hoc reasoning is not discernible from the proposal itself. Contracting officers and bidders share an equal obligation to ensure clarity; agencies cannot be expected to read between the lines

---

[9] The various calendar designations are used to identify and differentiate phases of the training schedule. In its evaluations, the Army references the rotational calendar directed by FORSCOM Regulation 350-50-2. (AR5823; AR5993).

and make sense of proposal terms. *AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 360 (2023). Thus, the Court finds that the Army did not unreasonably assign a weakness.

Next, WFS believes that it was unreasonable for the Army to give WFS a weakness under PWS Paragraph 5.13 because it incorrectly believed WFS "proposed to do additional work[.]" (Pl.'s MJAR at 16–18). PWS Section 5.13 explains that the JRTC MSS contractor is required to perform Reception, Staging, Onward Movement, and Integration ("RSOI") & Redeployment tasks. (AR2282). In response, WFS proposed staffing its Commodity Management Section with three full-time equivalent employees. (AR4161). These employees would "assist the [Rotational Training Unit]" in establishing and managing installation accounts for all "classes of supply identified in PWS 5.13.2." (*Id.*). WFS went on to state that "[t]he [RSOI] main office maintains the soldier's lounge, which is equipped with light refreshments for transiting soldiers." (*Id.*). The Army believed that WFS's proposal, specifically the mention of refreshments in the lounge, posed "a moderate risk as it can have a moderate impact to the rotational support and increase costs" because refreshments were not a PWS requirement. (AR5819; AR5992).

WFS believes the Army's assessment is unreasonable because WFS did not state it would provide refreshments; it is typically the responsibility of the Red Cross. (Pl.'s MJAR at 17–18). The United States asserts that WFS's failure to specify a third party's responsibility for refreshments constitutes a deficiency in its proposal. (Def.'s xMJAR at 27). The United States' argument is persuasive. Notably, WFS designated third-party involvement in other service delivery areas within its proposal. For instance, WFS explained that soldiers would transit to the Alexandria, Louisiana airport via shuttle coordinated by the RSOI office and the Fort Johnson Staff Duty Non-Commissioned Officer at the Alexandria airport. (AR4161). It also specifies that a Red Cross liaison is designated to act in other roles—i.e., assisting soldiers departing from Fort Johnson on emergency leave, reintegrating returning soldiers, and coordinating with the post agencies identified for transporting soldiers to their destinations via air travel. (*Id.*). The omission of the Red Cross's involvement in stocking refreshments is a notable contrast. Thus, it was not unreasonable for the Army to interpret WFS's proposal in this way.

WFS bases its argument, in part, on the Army's prior history with the contract; it claims the Army understood or should have understood that it would not be billed for refreshments in the lounge because they have not been in the past. (Pl.'s MJAR at 18). Because of this, WFS contends that there is no "rational connection between the facts found and the choice made," requiring the Court to set this finding aside. (*Id.* (citing *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 109 (2020)). Even if the Court were to engage in this analysis, doing so would be improper. WFS's argument ignores that providing explanations regarding proper charges to bidders consumes government funds and personnel resources. Put another way, the government suffers adverse effects when it must clarify responsibilities to an awardee, irrespective of any assumptions about the bidder's prior knowledge. WFS's argument is unconvincing.

Next, of more significance, WFS asserts that its proposed Chief of Scenario Development has the experience required by the solicitation and it was unreasonable for the Army to give [WFS] a significant weakness." (Pl.'s MJAR at 18). The Solicitation required bidders to propose personnel with minimum qualifications for certain labor categories, including the Chief, Scenario Development. (AR2423). PWS 1.15.1.11 dictated that this position required, at a minimum, Military Education Level ("MEL") 4, military experience at the combat arms brigade level or

11

higher, supervisory experience in exercise development, training management, or battle simulation commensurate with PWS requirements. (AR2137). The Government also desired a School of Advanced Military Studies graduate or equivalent. (*Id.*). WFS proposed a retired U.S. Army Lieutenant Colonel for this role. (AR4233–34). The Colonel's (ret.) resume purportedly explained that he received MEL 4 certification from the U.S. Army Command and General Staff College. (*Id.*). WFS explained that he also served as the Director of U.S. Army Europe's Crisis Action Branch where he "facilitate[ed] and support[ed] operations throughout the U.S. European Command Area of Responsibility." (*Id.*).

Army evaluators found these qualifications lacked the PWS's required brigade-level combat arms military experience. (AR5428; AR5466; AR5822). When WFS questioned this finding, the Army explained that the candidate's qualifications, including his "schoolhouse training," did not satisfy the requirement. (AR5993).

Arguing the converse, WFS now contends the Solicitation does not directly define "Combat Arms Brigade level," therefore "[r]ead using its common meaning, the Solicitation just required the candidate to have served in the military in a role at the brigade level or higher." (Pl.'s MJAR at 20). The United States correctly points out that this understanding eliminates the phrase "Combat Arms." (Def.'s xMJAR at 29–30). WFS's explanation within its proposal did not clearly articulate how its candidate's instructor position and experience at the Crisis Action Branch could be considered equivalent to the PWS's specified military experience requirement, despite providing this explanation for other team members. (*See* AR4214 (explaining proposed program manager commanded a cavalry squadron—the cavalry equivalent to an infantry battalion); AR4215 (explaining proposed deputy program manager commanded a joint task force brigade and two battalions)). Based on WFS's unclear explanation of how the Colonel's specific experience qualified him for this position under the PWS requirements, the Army's evaluation was reasonable. Moreover, even if it was inclined to second-guess this evaluation, the Court is poorly suited to do so. Gauging the quality of combat arms officers at the brigade level is not something within the ken of courts.

To the extent WFS argues that the solicitation requirement was unclear because it was not defined, (Pl.'s MJAR at 20), there is no merit. Although agencies must evaluate proposals and make awards based on the solicitation's stated criteria, *Banknote Corp. of Am.*, 56 Fed. Cl. at 377–78, agencies also have "broad discretion" when evaluating technical proposals. *Red Cedar Harmonia, LLC v. United States*, 840 F. App'x 529, 532–33 (Fed. Cir. 2020). "[A] solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Banknote Corp. of Am.*, 56 Fed. Cl. at 387. Even if the PWS's specific wording regarding brigade-level combat arms military experience might be subject to varying interpretations, the Army's evaluators determined that WFS's candidate did not satisfy the intent and substance of that requirement. Thus, the Army's evaluation was a valid exercise of its discretionary authority.

WFS next believes that the Army "unreasonably evaluated [WFS]'s Small Business Participation proposal and abused its discretion by not seeking clarifications" of clerical errors. (Pl.'s MJAR at 21). Factor 3 examined "the level of proposed participation of small businesses in the performance of the acquisition." (AR2448). The Solicitation outlined five considerations for the Army's evaluation of this factor: (1) the extent to which the offeror identified specific small

businesses; (2) the extent of commitment through enforceable agreements; (3) the complexity and variety of the work given to small businesses; (4) the extent of small business participation as a percent of the total contract value; and (5) the extent to which the offeror met or exceeded socioeconomic minimum quantitative requirements. (*Id*.). The Army's evaluation would result in an adjectival rating, with "Outstanding" indicating that the proposal showed "an exceptional approach and understanding of the small business objectives," and "Good" indicating that the proposal showed "a thorough approach and understanding of the small business objectives." (AR2448–49). Significantly, the Army assigned a "Good" rating to both WFS and Valiant. (AR5664–65; AR5733–34).

WFS's proposal included five small business partners, each identified as meeting a particular socioeconomic criterion. (AR4072; AR4831–32). The Army took issue with inconsistencies in WFS's arrangement with ███████████████████████. (AR5663–66). First, Tables 4 and 5 of WFS's proposal presented conflicting information regarding ████ support for PWS section 5.6 tasks, with Table 4 listing ████ and Table 5 limiting support to specific socioeconomic categories. (AR4835; AR5665). Second, a discrepancy existed between the teaming agreement with ████, which assigned support for PWS section 5.7, and the proposal's assertion of no small business support for that section. (AR5666; AR4898; AR4835). Third, the Army found that ████ lacked the claimed veteran-owned or service-disabled veteran-owned certifications and had no pending applications for certification. (AR5666; AR5682). Finally, the teaming agreements contained errors, such as improper vernacular, incorrect solicitation numbers, and misidentification of the prime contractor. (AR5665–66). WFS argues that the Army's observation rendered an unreasonable belief that the agreements were "unenforceable," thereby reducing its rating to "Good." (Pl.'s MJAR at 21–22). WFS further believes that the Army abused its discretion by failing to seek clarification on the clerical errors in WFS's teaming agreements. (*Id*. at 22–25).

As stated above, offerors bear the burden of submitting an adequately written proposal. *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 223 (2020). The agency "is not expected to hunt for potentially responsive information that is not included or not adequately presented in the relevant section of an offeror's proposal." *ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 110 (2013); *see also CACI, Inc.-Fed. v. United States*, 158 Fed. Cl. 1 (2021) ("Agencies must indeed review the whole proposal, but they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal."), *vacated on other grounds*, 67 F.4th 1145 (Fed. Cir. 2023). As to the Army's responsibility to seek clarification, a contracting officer has the discretion to ask an offeror "to clarify certain aspects of proposals . . . or to resolve minor or clerical errors." FAR § 15.306(a)(2); *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1322-23 (Fed. Cir. 2003). While the evaluator did note some clerical errors, they were items the evaluator recommended the Army discuss with WFS "[i]f the Government decides to go into discussions with the Offeror." (AR5665). Since the Army opted to award without discussions, clarification was unnecessary.

The Court concludes that the evaluator's findings are reasonable. The Army's positive rating of WFS's small business participation was not solely predicated on the potential unenforceability of the teaming agreement. Instead, the rating reflected a comprehensive evaluation of WFS's proposal, considering the combined deficiencies previously outlined. This

13

holistic assessment, considering both strengths and weaknesses, provides a rational and justifiable explanation for the Army's overall rating of WFS's small business participation.

In bid protests, it is not the role of the Court to second-guess the agency's discretionary determinations, particularly regarding technical evaluations. *See Off. Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020) (rejecting protestor's argument that would "give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings."). Rather, the Court determines whether the agency evaluated the proposals and explained a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). WFS's contentions regarding its ratings, focusing on mere disagreements with the agency's evaluations, fail to engage with the Court's established standard of review. *See Glenn Def. Marine (ASIA), PTE Ltd.*, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."). The Court finds no reason to disturb the Army's rationally supported findings.

### D.  *The Army's cost realism analysis was reasonable.*

Cost was the overriding factor in this procurement behind Mission Capability. (AR2441). The solicitation indicated that the Army would conduct a "cost realism analysis . . . on the cost-reimbursement CLINs." (AR2449). WFS objects to the Army's analysis of the realism of WFS's proposed costs for overhead ("OH") and general & administrative expenses ("G&A"). (Pl.'s MJAR at 25–30). The Court finds that the Army's cost adjustment procedures and explanations were proper, and no basis exists to disturb its conclusions.

The FAR defines a "[c]ost realism analysis" as the process behind independently reviewing and evaluating specific elements of each offeror's cost estimate to determine whether "the estimated proposed cost elements are[:] realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." 48 C.F.R. § 15.404-1(d)(1). A cost realism analysis is required for cost-reimbursement contracts "to determine the probable cost of performance for each offeror." FAR § 15.404-1(d)(2). In essence, a cost realism analysis determines whether a proposed cost is too low and thereby increases the risk of overcharging. *See DynCorp. Int'l, LLC v. United States*, 10 F.4th 1300, 1305 (Fed Cir. 2021); *Agile Def., Inc. v. United States*, 959 F.3d 1379, 1384 (Fed. Cir. 2020). "[C]ontracting agencies enjoy wide latitude in conducting the cost realism analysis." *Agile Def.*, 959 F.3d at 1385–86 (citing *Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 211 (2019) ("It is well established that contracting agencies have broad discretion regarding the nature and extent of a cost realism analysis, unless the agency commits itself to a particular methodology in a solicitation.")). "[A]n agency need not perform the analysis with impeccable rigor to be rational. Rather, the cost realism analysis must reflect that the agency considered the information available and did not make irrational assumptions or critical miscalculations." *Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 260 (2015) (cleaned up); *see also OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000). Accordingly, the Court's "scope of review of an agency's cost realism

14

determination is very narrow." *McConnell Jones Lanier & Murphy LLP v. United States*, 128 Fed. Cl. 218, 236 (2016).

The Army directed bidders for this procurement to justify unique, cost-saving practices clearly and establish a direct link between proposed costs and technical proposal requirements. (AR2432 ("Data . . . **is required** to be submitted to support the cost realism analysis of the cost-reimbursement CLINs") (emphasis in original); AR2449 ("A cost realism analysis will be performed on the cost-reimbursement CLINs to determine whether specific estimated proposed cost elements are realistic for the work to be performed . . . . [T]he Offeror is advised to clearly show justification for unique practices that significantly lower costs"); *id*. (stating that the government would "calculate an evaluated cost" by adjusting the offeror's proposed cost so that it would "reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis. The evaluated cost may differ from the proposed cost and will reflect the Government's best estimate of the cost that is most likely to result from the Offeror's proposal[.]")).

To evaluate OH and G&A costs, the Army considered each offeror's "unique approach" and established a "hierarchy" of support for the rates.[10] (AR5565). In its proposal, WFS summarized its approach, focusing on its business structure and the added value it would contribute to this particular contract:

> WFS is a populated [Joint Venture] purposely built and solely focused on providing support to the JRTC mission as it changes and evolves with the global security environment enabling clarity of purpose, unity of effort, and exceptional cost effectiveness. Focusing the JV on only one contract allows us to remain as efficient as possible in our corporate structure and processes, thus minimizing our overhead costs to only those aspects that are required to support the JRTC MSC. This efficiency simultaneously gives WFS small business agility with a flat organizational structure and the large business experience and backbone of two Army Training Center Support Defense Industry leaders . . . as the managing member and . . . the minority member.

(AR4919). WFS went on to reiterate that the "G&A cost pool is where the customer sees the most benefit of this cost structure[,]" because all management and business support expenses are "specific to JRTC and create a significant cost savings." (AR4926). WFS's proposal acknowledged that WFS "[did] not have a Forward Pricing Rate Agreement, or approved billing rates" and that WFS did not have historical rates. (AR4924). Instead of this, WFS proposed to "use[] the expertise and experience from both [joint venture] members to build an indirect budget specifically to support the" JRTC MSS contract. (*Id*.).

---

[10] An OH rate is calculated by dividing the proposed OH cost by the total labor costs (direct and fringe). (AR5577). A G&A rate is calculated by dividing the proposed G&A cost by the sum of labor, OH, and subcontractor costs. (AR5578).

WFS proposed $_____ for OH, calculated at an average rate of ___% throughout the contract.[11] (AR5577). WFS stated that this rate included "allowable indirect costs related to the program management and support team, management facility, office expense and this contract" as well as "allowable indirect expenses related to administrative, project and contract management, security, training and certifications, and contract specific insurance requirements." (AR4926). WFS's G&A proposal was $_____, based on a ___% average rate for the contract duration. (AR5577–78). WFS stated that its G&A rate included costs for "executive management, personnel administration, finance and accounting, information technology, and contract management at the WFS home offices." (AR4926).

During the evaluation, the Army observed that WFS, as a recently formed joint venture, did not have the necessary documentation, such as rate agreements or historical rates, to justify its proposed rates. (AR5577). To assess WFS's proposed OH and G&A costs, the evaluator used the average rates of other contractors, determining an average OH rate of 3.52% and a G&A rate of 6.84%. (AR5577–78). As a result, the Army determined that WFS's most probable cost for OH was $_____ and for G&A was $_____.[12] (AR5577).

WFS argues that, as an initial matter, the sample size of two bidders was too small to use an average rate, making it irrational. (Pl.'s MJAR at 27). This argument is not convincing. First, it ignores (but does not refute) that the Army included subcontractors in this analysis. (*See* AR5577). Further, in performing their calculations, Army evaluators adopted one of the approaches specifically envisioned by the FAR: "Comparison of costs proposed by the offeror for individual cost elements with . . . [o]ther cost estimates received in response to the Government's request." FAR 15.404-1(c)(iii). This provision makes no exception for when the number of bidders is slim. The evaluator was left with little other option, given the lack of rate information from WFS. (*See* AR4924 (WFS acknowledging that its proposal lacked empirical information and relied instead on the expertise and experience of its members)). A cost realism analysis simply must reflect that an agency considered the information available. *See Crowley Tech. Mgmt.,* 123 Fed. Cl. at 260. The step-by-step nature of the Army's process, (AR Tab 32), demonstrates that it did just that.

WFS contends that its status as a "populated joint venture" necessarily results in lower OH and G&A costs. (Pl.'s MJAR at 25–26). Agencies cannot reasonably be expected to accept assertions lacking data-driven proof. It is precisely this sort of general assertion that the Army took issue with in its analysis. The United States highlights that WFS used its claim of a tailor-made joint venture exclusively as a basis for its proposed G&A expenses. (Def.'s xMJAR at 40

---

[11] WFS states that its "proposed overhead rate was ___% and its G&A rate was ___%." (Pl.'s MJAR at 26 (citing AR4924)). It appears this difference comes from the Army's calculation of the average throughout the contract. (*See* AR5577). That said, this particular percentage is not integral to the Court's decision.

[12] Upon completion of the cost adjustments, Valiant's projected cost was determined to be $478,079,108.95, approximately $10 million less than WFS's adjusted cost of $488,325,407.81. (AR5796).

(citing AR4926)). WFS's arguments stemming from its status as a populated joint venture challenge the Army's cost-realism analysis methodology. But these arguments dispute a decision within the Army's broad discretion. By using this method, the Army did not ignore WFS's unique approach as WFS suggests. (*See* Pl.'s MJAR at 28 ("By adjusting [WFS] to the average, the Army treated it like any other contractor, not a populated joint venture created for this contract.")). Rather, it considered "whether specific estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the contract requirements; and are consistent with the unique methods of performance described in the Offeror's technical proposal." (AR5739). That the specifics of WFS's unique approach were incongruous with realistic considerations does not render the evaluation unreasonable.

WFS has failed to demonstrate any substantive errors in the Army's cost realism analysis. Its primary contention revolves around a disagreement regarding the methodology used to calculate certain figures rather than identifying any demonstrable flaws in the Army's process. It is well-established that mere disagreements with an agency's methodology do not constitute grounds for overturning a cost realism analysis. WFS has not shown that the Army failed to consider the available information, nor has it shown that the Army made irrational assumptions or critical miscalculations." *See Crowley Tech*. *Mgmt*., 123 Fed. Cl. at 260. Accordingly, this claim is rejected.

  E. *WFS's other arguments fail, and it is not entitled to relief*.

WFS argues that the Army's errors prejudiced WFS. (Pl.'s MJAR at 31–33). As discussed, WFS has not shown error. Beyond disputing the Army's evaluation of its proposal, WFS provides no alternative basis for overturning the best value decision. WFS primarily attempts to demonstrate how alleged errors negatively affected its chances for award. Because the Court has not found error, there is no basis to evaluate prejudice.

WFS finally requests the Court to enter permanent injunctive relief. (Pl.'s MJAR at 33–35). There is no basis to do so. Injunctions are a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co*. *v*. *Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted). To obtain permanent injunctive relief, a party must demonstrate: (1) success on the merits; (2) irreparable harm if an injunction does not issue; (3) the balance of harm favors the movant; and (4) that the injunction serves the public interest. *See PGBA*, *LLC v*. *United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *Amazon Web Servs*., *Inc*. *v*. *United States*, 147 Fed. Cl. 146, 153 (2020). Although "[n]o one factor, taken individually, is necessarily dispositive . . . , the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial." *FMC Corp*. *v*. *United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). Because WFS has failed to establish success on the merits, there is no need for further analysis. WFS's request for a permanent injunction is denied.

  F. *Miscellaneous Motions*

WFS moves to supplement the administrative record with a declaration regarding the Army's history about who stocked the refreshments in the soldiers' lounge. (ECF No. 26; *see also* Am. Compl. App'x A (Declaration of C. Bryan Dyer)). The ability to submit additional

17

information into an administrative record is limited. *Axiom Res. Mgmt.*, 564 F.3d at 1379. The purpose of limiting review to the record before the procuring agency is to prevent courts from using new evidence to "convert the 'arbitrary and capricious' standard into effectively *de novo* review." *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005). Because the focal point for judicial review is the agency's administrative record, "the standard for discovery in the bid protest context is narrower" than in non-bid protest cases. *Proxtronics Dosimetry, LLC v. United States*, 128 Fed. Cl. 656, 681 (2016); *see also Murakami*, 46 Fed. Cl. at 735 ("[E]xceptions to the general rule against extra-record evidence are based upon necessity, rather than convenience, and should be triggered only where the omission of extra-record evidence precludes effective judicial review.").

The Court must grant a request to supplement the administrative record only "if necessary for effective judicial review or if the existing record cannot be trusted." *Diversified Maint. Sys. v. United States*, 93 Fed. Cl. 794, 802 (2010) (internal quotations omitted); *cf. Axiom Res. Mgmt.*, 564 F.3d at 1381. Only in extremely limited circumstances is supplementation of the administrative record appropriate, such as where the agency failed to consider relevant factors or where there is some evidence of bad faith or improper behavior by agency officials. *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 342 (1997)); *see also Axiom Res. Mgmt.*, 564 F.3d at 1379 (citing *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997)). This Court is limited to supplementing the record in instances in which it can "explain why the evidence omitted from the record frustrated judicial review as to the ultimate question of whether [the agency action] was arbitrary and capricious." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (citing *Axiom Res. Mgmt.*, 564 F.3d at 1379–80).

WFS claims that without such supplementation, the Court will lack information that is "generally known in the industry or discipline," and is "necessary for the Court to have a complete understanding of the issues before it." (ECF No. 26 (internal citations omitted)). The Court finds that WFS's goal is to present information to the Court that it should have provided or clarified within its proposal. The Court cannot allow a party to present information required to be in its proposal, which it failed to include, through extraneous documentation as supplementation to an administrative record in a bid protest. *Int'l Res. Recovery, Inc. v. United States*, 60 Fed. Cl. 428, 432 (2004). Given the nature of this document and its findings regarding the Army's reasonable evaluation, the Court finds that this document does not aid judicial review. Therefore, WFS's Motion is denied.

Further, the Court directed the parties to attach appendices of cited materials to their briefs. (ECF No. 12). Valiant and WFS failed to do so; to self-correct, they each moved to file corrected briefs, (ECF Nos. 40, 42). Those motions are granted. The Court notes that refiling these documents is unnecessary as the Court relied on the corrected briefs attached to each motion, (ECF No. 40 at 4–57; ECF No. 42-1, 42-2, 42-3), for purposes of this ruling.

### III.    Conclusion

For the reasons stated above, WFS's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 27), is **DENIED**. The United States' and Valiant's Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 29; Int-Def.'s xMJAR, ECF

No. 28), are **GRANTED**. WFS's Motion to Supplement, (ECF No. 26), is **DENIED**. Valiant's and WFS's motions to correct their respective briefs, (ECF Nos. 40, 42), are **GRANTED**.

The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this memorandum opinion within fourteen (14) days of its entry to allow the Court to file a public version of the opinion.

**IT IS SO ORDERED.**



s/   David A. Tapp
DAVID A. TAPP, Judge